# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

SUSAN MARTINEZ,

       Plaintiff,

v.                                      CASE NO.: 3:15-cv-1215-J-34JBT

                                        **JURY TRIAL DEMANDED**

MARKET TRADERS INSTITUTE, INC.,
MARKET TRADERS INSTITUTE FINANCIAL, INC.,
NEXT STEP FINANCIAL HOLDINGS, INC.,
EFOREX, INC. (nka EASY EFOREX, INC.),
FX CURRENCY TRADERS, INC.,
I TRADE FX, LLC, JACOB MARTINEZ,
LISA K. ESTRADA, JOSHUA MARTINEZ,
ISAAC MARTINEZ, INSTITUTIONAL
LIQUIDITY, LLC, AND NAVITAS INVESTMENTS, LLC,

       Defendants.

_____/

## AMENDED COMPLAINT

    **COMES NOW** the Plaintiff, **SUSAN MARTINEZ** (the "Plaintiff"), by and through the

undersigned counsel, hereby brings this Amended Complaint against Defendants **MARKET

TRADERS INSTITUTE, INC., MARKET TRADERS INSTITUTE FINANCIAL, INC.,

NEXT STEP FINANCIAL HOLDINGS, INC., EFOREX, INC. (nka EASY EFOREX,

INC.), FX CURRENCY TRADERS, INC., I TRADE FX, LLC, INSTITUTIONAL

LIQUIDITY, LLC, NAVITAS INVESTMENTS, LLC,  JACOB MARTINEZ, LISA K.

ESTRADA, JOSHUA MARTINEZ,** and  **ISAAC MARTINEZ,**    the directors, officers,

employees, agents, servants and all other persons in active concert or in participation with them

(collectively referred to herein as the "Defendants"), for violations of and associated damages

pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C §§ 1961 *et seq.* In support thereof, Plaintiff alleges as follows:

## NATURE OF ACTION

1.    This is a cause of action alleging violations of the federal RICO on behalf of Plaintiff Susan Martinez, who was damaged by the acts of Defendants, together with certain named and as yet unnamed employees, directors, agents, co-conspirators, and aiders and abettors, engaged in federal and state statutory criminal fraud, thereby damaging the Plaintiff. The Plaintiff further alleges that these defendants then conspired to cover-up their fraudulent acts and committed additional acts.

2.    The predicate acts alleged herein involve violation of bank secrecy law relating to reports of currency transactions through activity in the foreign exchange markets, mail fraud and theft, computer-related crimes, fraudulent practices, false pretenses, fraud generally, offenses related to financial transactions and conduct defined as "racketeering activity" under 18 U.S.C. § 1961(1). The pattern of racketeering activity engaged in by Defendants has damaged Plaintiff Susan Martinez's property and business interest in Market Traders Institute, Inc., which has inflicted severe and sustained economic hardship upon Plaintiff.

## JURISDICTION AND VENUE

3.    This Court has federal subject matter jurisdiction of the RICO claim as a federal question pursuant to 28 U.S.C. §§ 1331 and 18 U.S.C. § 1964(c) (civil remedies for RICO violations); and supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367(a).

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965.

## PARTIES

5.      Plaintiff, Susan Martinez is a citizen of the State of Florida, residing in Palm Coast, Florida.

6.      Defendant Market Traders Institute, Inc. is a corporation organized under the laws of the State of Florida with its principal place of business 400 Colonial Center Parkway, Lake Mary, FL 32746.

7.      Defendant Market Traders Institute Financial, Inc. is a corporation organized under the laws of the State of Florida with its principal place of business 400 Colonial Center Parkway, Lake Mary, FL 32746.

8.      Defendant Next Step Financial Holdings, Inc. is a corporation organized under the laws of the State of Florida with its principal place of business 400 Colonial Center Parkway, Lake Mary, FL 32746.

9.      Defendant EForex, Inc., nka, Easy EForex Inc., (collectively referred to as "EForex") is a corporation organized under the laws of the State of Florida with its principal place of business 400 Colonial Center Parkway, Lake Mary, FL 32746.

10.     Defendant FX Currency Traders, Inc. ("FXCT") is a corporation organized under the laws of the State of Florida with its principal place of business 400 Colonial Center Parkway, Lake Mary, FL 32746.

11.     Defendant I Trade FX, LLC ("I-Trade") is a company organized under the laws of the State of Florida with its principal place of business 400 Colonial Center Parkway, Lake Mary, FL 32746.

12.     Defendant Institutional Liquidity, LLC ("ILQ") is a company organized under the laws of the State of Florida, having taken over the entity known as I Trade FX, LLC, with its principal place of business 25 Ionia Ave SW Suite 506 Grand Rapids, MI 49503.

13.     Defendant Navitas Investments, LLC, is a company organized under the laws of the State of Michigan, having also taken over the entity known as I Trade FX, LLC, with its principal place of business 2625 Denison Drive, Suite A, MT. Pleasant, MI 48858.

14.     Defendant Jacob Martinez is a citizen of the State of Florida, residing within the U.S. District Court for the Middle District of Florida.

15.     Defendant Lisa K. Estrada is a citizen of the State of Florida, residing within the U.S. District Court for the Middle District of Florida.

16.     Defendant Joshua Martinez is a citizen of the State of Florida, residing within the U.S. District Court for the Middle District of Florida.

17.     Defendant Isaac Martinez is a citizen of the State of Florida, residing within the U.S. District Court for the Middle District of Florida.

## FACTUAL BACKGROUND

18.     Defendant Market Traders Institute, Inc. ("Market Traders") is an entity created by Plaintiff Susan Martinez and her husband Jared Martinez ("J. Martinez") in 2002, to offer education and training to individuals interested in learning about the forex markets.  At all times relevant herein, Plaintiff has had an ownership interest in fifty (50) percent of Market Traders.

19.     In September 2009, Plaintiff and J. Martinez separated for a second time, and on or about November 17, 2009, Plaintiff files an Initial Petition for Dissolution of Marriage in Seminole County, Florida ("Circuit Court Case") against her husband J. Martinez.

4

20.     By on or about May 7, 2010, as the result of an Order in the Circuit Court Case and actions related thereto, Plaintiff was rendered without any control or operational involvement with Defendant Market Traders.

21.     On or about October 29, 2010, Market Traders Institute Financial, Inc., is formed as a Florida Corporation with Defendant Jacob Martinez as an officer.

22.     On or about November 15, 2010, the State of Florida Office of Financial Regulation finally denied Market Traders a Resellers License for business as a result of Market Traders earlier in 2010 having entered into numerous retail installment contracts without the benefit of a Retail Installment Sellers license required under Florida law and for misrepresenting the status of legal proceedings against it to the Office of Financial Regulation.

23.     On or about November 29, 2010-Defendant Next Step Financial Holdings, Inc. ("Next Step") is formed as a Florida Profit Corporation, with Defendant Joshua Martinez as President, Director, Secretary and Treasurer. Defendant Next Step starts leasing employees from Market Traders.  Defendant Next Step was eventually merged with Defendant Market Traders on or about December 31, 2013.

24.     FXCT was a Foreign Exchange Firm ("Forex Firm") and member of the National Futures Association (NFA") from October 2010 through September 14, 2011, when FXCT withdrew from NFA membership. For almost two years, prior to October 2010, FXCT was an unregistered solicitor for Forex Capital Markets LLC ("FXCM").

25.     Foreign exchange trading is a market that runs 24/7 and offers global currency pairs for trading. The NFA is the self-regulating governing body that provides the regulatory framework to ensure transparency, integrity, abiding of regulatory responsibilities, and protection of various market participants in the foreign exchange markets.

5

26.     Market Traders, among other things, generated leads for FXCT and allowed FXCT to operate out of Market Traders' offices.

27.     FXCT and Market Traders entered into an Accounting and Clerical Services Agreement ("Agreement") dated January 1, 2010. The January 2010 Agreement superseded a May 2009 Agreement between FXCT and Market Traders, and specified that Market Traders would provide FXCT with general accounting, customer support, and advertising and marketing services, and also provide customer leads to FXCT. Defendant Jacob Martinez executed this Agreement on behalf of both FXCT and Market Traders. The January 2010 Agreement obligated FXCT to pay Market Traders 10% of the commissions earned on trades in accounts that came from leads generated by Market Traders.

28.     For almost two years, prior to October 2010, FXCT was an unregistered solicitor for Forex Capital Markets LLC.

29.     NFA commenced an audit of FXCT in January 2011. At the time of NFA's audit of FXCT, the firm introduced approximately 3,600 customer accounts to FXCM and over 700 foreign accounts to Forex Capital Markets, Ltd. ("FXCM UK"), FXCM's affiliate in the United Kingdom. Defendant Jacob Martinez was FXCT's sole owner and chief executive officer.

30.     In addition to Defendant Jacob Martinez's roles with FXCT and Market Traders, from April 2008 through April 2010, Defendant Jacob Martinez was a listed principal of I-Trade, a registered futures commission merchant ("FCM") and Forex Dealer Member ("FDM") of NFA. Defendant Jacob Martinez shared ownership of I-Trade with his father, J. Martinez, and his brother, Defendant Isaac Martinez.

31.     While Defendant Jacob Martinez was a principal of I-Trade, an NFA Hearing Panel fined the firm $250,000 in April 2009 for failing to implement an adequate anti-money

6

laundering ("AMU") program by not sufficiently investigating suspicious activity in several customers' accounts. NFA's Appeals Committee affirmed the Hearing Panel's Decision as to I-Trade in January 2010 and also found that Defendant Jacob Martinez's brother, Defendant Isaac Martinez, failed to carry out his supervisory duties and ordered him to pay a $50,000 fine.

32.     Defendant Jacob Martinez, as a principal of I-Trade, knew implementation of an anti-money laundering program was required for its business operations; however, he willfully and knowingly failed to implement the same to further the scheme to defraud consumers in the forex markets.

33.     A central figure in the suspicious activity at I-Trade was David Smith ("Smith"), a former I-Trade principal who controlled several of the I-Trade accounts that were the focus of NFA's disciplinary case against the firm and ran a Ponzi scheme that bilked approximately 6,000 investors in Florida and the Caribbean out of $220 million. On August 11, 2011, a Florida federal court sentenced Smith to 30 years in prison for fraud and money laundering. In addition, a court in the Turks and Caicos Islands sentenced Smith to over six years in prison for fraud and conspiracy. Several former I-Trade customers have also filed civil lawsuits against Smith, I-Trade, Defendant Jacob Martinez, J. Martinez, Defendant Isaac Martinez, as well as numerous other parties, including Market Traders, regarding their alleged involvement in Smith's Ponzi scheme.

34.     Smith's guilty plea in or around August 2011, revealed the validity of specific fraudulent wire transfers by Smith through I-Trade that affected the property interests of Plaintiff Susan Martinez in Market Traders,  as follows:

| DATE | AMOUNT | FROM | TO | WIRE TRANSFER/ DISTRIBUTION |
|------|--------|------|----|------------------------------|
| March 23, 2007 | $10,000,000 | i-Trade – Bank of America Account # ********3888 | JIJ Investments, LLC (JIJ) – Wachovia Account | #20070323-00162406 |

| | | Lake Mary, Florida | # **********4333 | |
|---|---|---|---|---|
| March 26, 2007 | $10,000,000 | JIJ – Wachovia Account #20000319644333 | i-Trade – Bank of America # ********3888 Lake Mary, Florida | #20070326-00021055 |
| March 28, 2007 | $2,000,000 | i-Trade – Bank of America Account # ********3888 | JIJ – Wachovia Bank Account # **********4333 | #20070328-00119619 |
| March 28, 2007 | $30,000,000 | i-Trade – Bank of America # ********3888 Lake Mary, Florida | JIJ – J.P. Morgan Chase Account #****265-5 | #20070328-00104855 |
| March 28, 2007 | $29,000,000 | i-Trade – Fidelity Account #*****9976 Lake Mary, Florida | JIJ – Fidelity Account #****9229 | #A408673 |
| May 21, 2007 | $1,091,400 | TCI FX Traders (TCI FX) – First Caribbean International Bank Account # ***1316 | JIJ – Wachovia Account # ********4391 | #0705212080009204 |
| June 1, 2007 | $4,000,000 | JIJ – Fidelity Account # *****9229 | OLINT – National Commercial Bank (NCB) Account # *****9587 | # 37221573 |
| October 16, 2007 | $500,000 | JIJ – Fidelity Account # *****9229 | JIJ – Wachovia Bank Account # *********4391 | #20071016-00057348 |
| October 24, 2007 | $2,500,000 | JIJ – Fidelity Account # *****9229 | JIJ – Wachovia Bank Account # *********4391 | #20071024-00043247 |
| October 31, 2007 | $19,999,985 | ONLIT – NBC Account # *****7866 | JIJ – Wachovia Account # *********4391 | #20071031-00077139 |
| December 19, 2007 | $19,999,985 | JIJ – Wachovia Account # *********4391 | ONLIT – NBC Account # *****7866 | # 2007121900023143 |
| January 17, 2008 | $21,979,823.60 | JIJ – Fidelity Account # *****9229 | JIJ – Wachovia Bank Account # *********4391 | #2008011700048535 |
| January 23, 2008 | $30,000,000 | JIJ – J.P. Morgan Chase Account # ****265-5 | JIJ – Fidelity Account # *****9229 | #0082900005016265 |

35.    The acts of Smith as set forth in paragraph 34 herein were on-going, concealed

from Plaintiff Susan Martinez and in conjunction with the acts or omissions of Defendants FXCT, Market Traders, Jacob Martinez, Isaac Martinez, as well as other parties, which damaged Plaintiff Susan Martinez's property and business interest in Market Traders.

36.     NFA carried out a January 2011 audit of FXCT that was prompted, in part, by Defendant Jacob Martinez's background and the relationship that he and FXCT had with Market Traders. NFA's audit found, among other deficiencies, that FXCT's business arrangement with Market Traders constituted impermissible business activity with a non-member of NFA that was required to be registered but was not; that FXCT, Defendant Jacob Martinez, and/or others failed to supervise the FXCT's operations and, in particular, failed to screen and supervise persons with whom FXCT conducted forex business, and failed to adequately review and supervise, the use of Market Traders' website which promoted and generated customer leads for FXCT; and that FXCT's financial books and records falsely reported FXCT's capital position.

37.     The failures and falsehoods set forth in paragraph 36 herein were part of the scheme to defraud consumers and the regulatory authority over forex markets regarding the true nature of the Defendants' business operations. These fraudulent schemes damaged Plaintiff Susan Martinez as they affected her property interest in Defendant Market Traders.

38.     At all times relevant herein, Defendant Market Traders provided not only educational services but also generated customer leads for FXCT in consideration of which FXCT paid Market Traders 10% of the commissions earned on trades in accounts obtained through leads provided by Market Traders.

39.     Defendant Market Traders promoted, and generated customer leads for, FXCT through its website, www.markettraders.com, which urged website viewers to learn about the forex market while being an active trader and invited them to open a demo or actual account, or

select a forex broker, through links to FXCT's website.   Immediately below the links was a reference to FXCT as being Market Traders' "preferred broker."

40.     As a result of Market Traders' promotion of FXCT, a number of customer leads were generated for FXCT.   According to NFA, Defendant Jacob Martinez represented to NFA that FXCT obtained about one-third of its clients through Market Traders' "solicitation efforts." In turn, FXCT paid Market Traders significant commission income for the customer accounts that were obtained through Market Traders' leads.

41.     The close relationship between FXCT and Market Traders and commissions paid to Market Traders taints Market Traders' recommendation of FXCT as a "preferred broker." Customers were not aware that a portion of any commissions they paid to FXCT were kicked back to Market Traders. This concealment of their relationship was done in furtherance of the scheme to defraud consumers and obtain their money when they would open trading accounts.

42.     Defendant Market Traders' employees would describe FXCT as "the brokerage side of the business" and told customers that Market Traders had asked FXCT to contact the customer. Customers of Market Traders were encouraged to open accounts through FXCT, instead of directly with FXCM, so that FXCT — and, in turn, Market Traders — could receive commission payments from the customer's trading activity.

43.     NFA described Defendant Market Traders as having acted as a de facto NFA registered introducing broker ("IB") for FXCT but was not registered as an IB or an NFA Member. As a result, FXCT unlawfully did business with Defendant Market Traders a non-Member which was required to be registered with the Commodity Futures Trading Commission ("CFTC"), but was not.

44.    To facilitate the unlawful business practices with Defendant Market Traders, in December 2010m FXCTs made two unsecured loans totaling $35,000.00 to Defendant Market Traders.  The loans were made for the purpose of facilitating unlawful purposes.

45.    Defendant Market Traders and FXCT engaged in these unlawful acts to continue to attract customers' deposits and engage in trading activity without the scrutiny of any regulatory body. The unlawful acts were part of the scheme to defraud consumers and also Plaintiff to the extent her business interests in Market Traders was damaged.

46.    FXCT's failure to supervise was especially egregious in regard to a firm called Eforex. From 2009 until early 2011, Eforex operated as an unregistered forex IB located in the country of Panama. Jacob Martinez had been a director of Eforex at one time and his brother, Isaac Martinez, was Eforex's president. As of January 2011, Eforex maintained the two largest accounts at FXCT with a combined balance of over $2 million. FXCM UK was the counterparty for these accounts.

47.    FXCT rebated to Eforex 85% of the pips (i.e., a pip measures the amount of change in the exchange rate for a currency pair) that FXCT earned on transactions in Eforex's accounts. From October 2010 through January 2011, FXCT rebated over $200,000 to Eforex, which represented approximately one-third of FXCT's commission earnings.

48.    NFA asked FXCT whether Eforex was doing business with United States retail customers. According to NFA, the response of FXCT was, "not to our knowledge." However, NFA learned from independent sources that Eforex, in fact, was doing forex business with United States customers and had approximately 130 United States customers, whose account equity exceeded $650,000. As such, Eforex was required to be registered with the CFTC, but it failed to obtain registration.

11

49.     FXCT and Defendant Jacob Martinez failed to exercise due diligence to determine if Eforex had United States customers and was, therefore, required to be registered with the CFTC. Again, these failures were purposeful so that the Defendants could continue to earn commissions on unlawful trades.

50.     An NFA audit revealed that FXCT used Defendant Jacob Martinez's dual relationship with FXCT and Market Traders to manipulate FXCT's financial books and records to ensure a steady flow of funds from FXCT to Market Traders while giving the appearance FXCT was in capital compliance at all times. The Defendants used US Mail, telephone and electronic communications  to disseminate false information about FXCT's capital compliance to keep the flow of commissions and new account deposits going and to avoid any additional capital requirements imposed by NFA.

51.     For example, FXCT made several large interest-free loans to Market Traders since FXCT began operating in 2008. Several of these loans were past due and in default. However, FXCT made no effort to collect these loans. Nor did FXCT charge Market Traders' interest on these loans once they were past due even though the loan agreements between FXCT and Market Traders provided for a 10% annual rate of interest upon default.

52.     FXCT's general ledger as of December 31, 2010 also indicated that FXCT wrote off $156,040 of Market Traders' loan indebtedness. According to NFA, Jacob Martinez and FXCT's internal accountant claimed the write-off must have been "a mistake" and reversed it after NFA questioned them about it. Despite the large loan receivable from Market Traders, FXCT made two additional unsecured loans totaling $35,000 to Market Traders in December 2010.

53.     Based upon an NFA investigation, in January 2011, FXCT was below its minimum net capital requirement as of December 31, 2010. To try to remedy this capital shortfall, FXCT endeavored to re-write history by going back several months and making adjustments to the way it treated payables to Market Traders, thereby giving the appearance that FXCT was in capital compliance as of December 31, 2010.

54.     As alleged above, FXCT and Market Traders had an agreement whereby FXCT compensated Market Traders for lead generation and other services it provided to FXCT (e.g., general accounting services, customer services and support). Normally, for the payables due to Market Traders for leads, FXCT would accrue for the payables at the end of the month and then, after the end of the quarter, FXCT would eliminate the payable by offsetting it against the loan receivable from Market Traders. For the payables for the other services provided by Market Traders, FXCT usually accrued for the payable at the end of the month and then paid it in cash the following month.

55.     According to NFA's investigation, contrary to its normal accrual practice for October, November, and December 2010, FXCT made an entry purportedly dated December 1, 2010 to offset the liability to Market Traders for leads provided in October and November 2010. FXCT made another entry purportedly dated December 29, 2010 for leads provided in December 2010 to prematurely offset the liability for expenses for which FXCT did not receive an invoice for until January 3, 2011. The January 3, 2011 invoice from Market Traders was for the entire quarter's balance even though the accounting entries indicated that the first two months had already been paid.

56.     Similarly, according to NFA's investigation, for other services Market Traders provided, FXCT again manipulated its accounting records by offsetting the non-current loan

receivable by $44,970 through an entry purportedly dated December 29, 2010, even though Market Traders did not actually issue its December 2010 invoice until December 30. Because of the supposed prior offset, the accrual for this liability dated December 31 had no effect on the FXCT's net capital position.

57.     NFA determined that if FXCT had followed its normal accounting procedures for these payables and not manipulated its books and records, FXCT's excess net capital would have dropped from about $4,800 to a negative excess net capital balance of more than $68,000 as of December 31, 2010. The false pretenses by FXCT of a net capital balance was intended to fraudulently deceive regulators and investors by creating the appearance of solvency.

58.     Defendant Jacob Martinez, as FXCT's CEO and 100% owner, had a significant controlling influence over the firm's operations. All firm employees reported to Jacob Martinez and he was ultimately responsible for making final business decisions on FXCT's behalf. Jacob Martinez also had a controlling influence over Market Traders, as its president, a 50% owner, and as signatory for Market Traders' agreements with FXCT. Therefore, through his role at both entities, Jacob Martinez was ultimately responsible for overseeing FXCT and its dealings with Market Traders to ensure FXCT complied with all NFA Requirements, including financial requirements.

59.     As the violations alleged above demonstrate, Jacob Martinez failed to adequately carry out his supervisory duties with the result that FXCT engaged in impermissible business activity with Market Traders, which was required to be registered as an IB but was not; failed to screen and supervise firms with which FXCT conducted forex business and failed to adequately review, and supervise the use of Market Traders' website which promoted and generated customer leads for FXCT; and manipulated FXCT's financial books and records to make it

appear as though FSCT was in compliance with its minimum capital requirement.  The foregoing acts were intended to fraudulently deceive regulators and investors.

60.    On October 17, 2011, the Business Conduct Committee of NFA issued a Complaint against FXCT, which was at the time a forex firm and independent introducing broker (IB) NFA Member. The Complaint also named Jacob Martinez as a respondent, who was at the time a registered as an associated person (AP) of FXCT and an NFA Associate.

61.    The Complaint alleged that FXCT violated NFA Compliance Rule 2-36(d) by doing business with a non-NFA Member, viz., Market Traders, which was required to be registered as an IB with the Commodity Futures Trading Commission (CFTC) but was not registered as such. The Complaint also alleged that FXCT violated NFA Compliance Rules 2-36(b)(1) and (e) by failing to carry out its supervisory duty to ensure that Market Traders, as FXCT's agent, did not use misleading and deceptive promotional material to generate customer leads. The Complaint further alleged that FXCT and Martinez violated NFA Compliance Rule 2-36(e) by failing to exercise due diligence to determine whether entities with which FXCT conducted business were required to be registered with the CFTC and NFA Members.

62.    In addition, the Complaint alleged that FXCT violated Compliance Rule 2-10 by failing to keep accurate financial records, and violated NFA Financial Requirements Section 5(a) by failing to maintain required minimum adjusted net capital. The Complaint also alleged that FXCT violated NFA Compliance Rule 2-36(c), as incorporated in and by NFA Compliance Rule 2-39(a), by failing to observe high standards of commercial honor and just and equitable principles of trade in that it manipulated its financial books and records to make it appear as though it was complying with its minimum capital requirement when it was not.

63. The Complaint further alleged that Jacob Martinez, as chief executive officer and sole owner of FXCT, violated NFA Compliance Rule 2-36(e) by failing to adequately carry out his supervisory duties as evidenced by the fact that he allowed FXCT to engage in impermissible business activity with Market Traders, that he failed to screen and supervise other entities with which FXCT did forex business, and that he manipulated FXCT's financial books and records to make it appear as though the firm was in capital compliance at all times when it was not.

64. In March 2012, FXCT and Jacob Martinez submitted an Offer in which they offered to settle the NFA case on certain terms and conditions, including that: (1) FXCT agreed not to reapply for NFA membership or act as a principal of an NFA Member; (2) Jacob Martinez agreed not to reapply for NFA associate membership or apply for NFA membership for a period of three years; (3) Jacob Martinez further agreed not to act in any capacity requiring registration or to act as a principal of an NFA Member during this three-year period.

65. The acts of FXCT, Jacob Martinez, Market Traders and Market Traders Institute Financial, Inc. were unlawful acts taken with the intent to defraud consumers out of their money in the form of illegally gained commissions and to defraud NFA and the general public regarding the nature of their relationships to each other and their level of capital strength and liquidity. All of these acts fall within the definition of "racketeering activity" under 18 U.S.C. § 1961(1).

## DEFENDANT ILQ AND RELATED DEFENDANTS

66. Defendant ILQ is located in Grand Rapids, Michigan. ILQ has been registered as an FCM since August 2006 and became an RFED and FDM in April 2011. In October 2013, ILQ became an omnibus FCM and started holding customer segregated funds. ILQ's primary business to date has been acting as the counterparty to forex customer transactions. However, since 2011, ILQ has routinely suffered net losses virtually every month.

67.     ILQ, formerly known as I-Trade, when the firm was owned and operated by Jared Martinez and his sons, Jacob and Isaac Martinez. Lisa K. Estrada was Chief Compliance Officer for I-Trade beginning in November 2007.  In April 2009, an NFA Hearing Panel fined I-Trade $250,000 for failing to implement an adequate anti-money laundering program by not sufficiently investigating irregular activity in several customers' accounts to determine if the firm should have filed suspicious activity reports. NFA's Appeals Committee affirmed the Hearing Panel's Decision as to I-Trade in January 2010 and also found that Isaac Martinez failed to exercise his supervisory duties, in violation of NFA Compliance Rule 2¬36(e), and ordered him to pay a $50,000 fine.

68.     Smith, a former I-Trade principal who controlled several of the I-Trade accounts that were the focus of NFA's disciplinary case against the firm, ran a Ponzi scheme that bilked about 6,000 investors in Florida and the Caribbean out of $220 million. In August 2011, a federal judge in Orlando, Florida sentenced Smith to 30 years in prison, after he pled guilty to charges of fraud and money laundering.

69.     In May 2009, while NFA's disciplinary case against I-Trade was pending, the firm ceased operating and stopped holding customer funds, even though its FCM registration and NFA membership statuses remained intact. A few months after the disciplinary case ended, I-Trade was sold to Navitas Investments LLC (Navitas). Navitas was formerly known as Institutional Liquidity Holdings LLC, but changed its name to Navitas in August 2010. Navitas changed the firm's name from I-Trade to ILQ in August 2010, and ILQ resumed holding forex customer funds under its new ownership on April 29, 2011.

70.     Navitas is owned by Harrison Associates Limited (Harrison Associates) and James Pieron. Pieron previously owned a now defunct company called JDFX Holdings, Inc.

("JDFX"), which was a British Virgin Islands forex company located in Switzerland. JDFX had a business relationship with Trevor Cook (Cook), a former NFA Associate who pled guilty to operating a $200 million Ponzi scheme and was sentenced to a 25-year prison term in 2010. In a matter unrelated to Cook's Ponzi scheme, Cook was also sanctioned by an NFA Hearing Panel in 2005 for failing to uphold high standards of commercial honor and just and equitable principles of trade. Upon questioning by NFA about Pieron's relationship with Cook, Defendant Pieron's attorney represented that Pieron had no involvement with or knowledge of Cook's Ponzi scheme and merely worked as a business partner with Cook on a forex trading platform that Defendant Pieron's company had developed. However, NFA later obtained a transcript of testimony given by Cook in which he implied that some of the money from his Ponzi scheme passed through an account that was opened in the name of Pieron's mother in furtherance of the financial fraud on investors. In addition, the U.S. Securities and Exchange Commission alleged in a civil action that Cook sent $15 million to JDFX to purchase 35% of the company.

71.     Navitas' other owner, Harrison Associates, is wholly-owned by Harold McPike (McPike), who has been listed as a principal of ILQ since April 2011, but is not an AP of the firm or an NFA Associate. The NFA has alleged that Pieron and McPike became acquainted years ago, apparently while  Pieron was developing trading software in Switzerland. McPike also supposedly purchased arbitrage software from Pieron to trade forex in McPike's proprietary accounts. In addition, NFA noted in prior exams of ILQ that its staff monitors trading in one of McPike's accounts, even though ILQ does not carry the account.

72.     In May 2012, NFA issued a Complaint against ILQ, charging the firm with offsetting forex customers' trades with unauthorized counterparties, in violation of NFA Financial Requirements and contrary to the firm's obligation to uphold high standards of

commercial honor. In addition, these activities occurred under the supervision and guidance of Pieron, who was engaged in forex activities on behalf of ILQ at the time, even though he was not a registered AP or an approved forex AP at the time. The NFA Complaint settled in August 2012, with ILQ agreeing to pay a $50,000 fine and perform other undertakings.

73.     On or about October 26, 2012, Market Traders announced a partnership with EForex.  The partnership was announced to allegedly provide forex traders outside of the United States with currency trading resources.  EForex uses its forex trading experience to provide professional trading accounts for traders outside of the United States.  Additionally, EForex accounts will provide Market Trader's students with additional trading webinars and resources to be used with EForex trading accounts.

74.     In March 2013, Market Traders issued a press release touting a "strategic partnership" with ILQ and referred to ILQ as a "preferred partner" of Market Traders. Market Traders and the Martinez Defendants received funds from ILQ as part of the "strategic partnership" in circumvention of the legal prohibitions to Market Traders engaging in the activities of a registered futures commission merchant. Upon information and belief, at this time, Defendant Estrada, among others, resumed direct management involvement with ILQ following their prior management and administration of I-Trade, ILQ's predecessor entity.

75.     In early 2013, ILQ received a capital infusion of $14.5 million. After NFA learned of this, it commenced an investigation of ILQ to determine the source of the capital infusion, whether ILQ had properly disclosed any and all persons who contributed 10% or more of the firm's capital, whether the source of the capital infusion had the means to provide ILQ with future liquidity (if needed), and whether there was any suspicious activity in connection with the capital infusion.

76.     According to NFA, ILQ failed to promptly cooperate with NFA during the course of its investigation, which seriously impeded NFA's ability to complete its investigation in a timely fashion. Moreover, Pieron, when he was ILQ's Chief Executive Office, failed to adequately supervise ILQ to ensure that they fully cooperated with NFA.

77.     At the time NFA's investigation began in March 2013, ILQ had approximately 1,300 customer accounts and over $13 million in total customer liabilities. Since 2011, NFA believes based upon investigation that ILQ has relied extensively on Harrison Associates to support the company's operations and meet minimum net capital requirements. In fact, Harrison Associates is presently owed over $38 million through subordinated loans agreements (SLAs) granted to ILQ.

78.     NFA had been concerned about ILQ's capital position for some time. In August 2012, NFA noticed that ILQ's daily forex filings showed a significant increase in capital charges on its uncovered forex inventory, which greatly impacted the firm's excess net capital ("ENC"). For example, from July 31, 2012 to August 9, 2012, the firm's total capital charges more than doubled, rising from just under $900,000 to over $2.3 million. However, as of August 9, 2012, ILQ's ENC only amounted to slightly more than $233,000, while the firm's liability to forex customers totaled almost $20 million. NFA shared its concerns about ILQ's financial situation in an August 15, 2012 letter, and asked the firm to submit daily net capital computations until further notice so NFA could ensure the firm remained in compliance with NFA Financial Requirements.

79.     In addition, ILQ's October 31, 2012 monthly financial statement, which was later amended, reported a net loss — which had been the trend at ILQ since the firm was purchased in April 2011 — and showed a negative ownership equity balance of approximately $1 million and

an ENC of approximately $900,000. These items, along with the large amount of subordinated loans from Harrison Associates that ILQ had used to fund its operations since 2011, caused the firm's equity-capital ratio to decline to 34%, which concerned NFA since firms are required to a have an equity-capital ratio of not less than 30%. In addition, the firm's capital charges on uncovered forex positions remained sizable at more than $1.4 million.

80.     NFA expressed its ongoing concerns about ILQ's capital position in a December 5, 2012 letter to ILQ asking for an explanation of the actions ILQ planned to take regarding the situation. On December 6, 2012 ILQ responded in a letter to NFA which he stated that ILQ's "financial partner" maintained "unwavering support" of ILQ as evidenced by the SLAs the firm had continued to receive. The letter also stated that ILQ was in active discussions with its "financial partner" to receive an additional capital contribution that would substantially increase the firm's ENC.

81.     Thereafter, on January 16, 2013, Harrison Associates infused $14.5 million into ILQ to improve the firm's capital position. As a result, the firm's ENC rose to almost $13 million as of January 31, 2013 and the ownership equity balance increased to more than $13.1 million. Then, on March 14, 2013, ILQ and Harrison Associates entered into another SLA, converting $12.5 million of Harrison Associates' January 2013 capital contribution into an equity capital subordinated loan. ILQ subsequently provided NFA with screenshots of the ILQ bank account that received the funds, along with copies of the wire advices. These documents showed that $12.5 million was infused directly from Harrison Associates, while the other $2 million was indirectly sent to ILQ from Harrison Associates via Navitas.

82.     Because the January 2013 capital infusion made up all of ILQ's ownership equity at the time and because the $12.5 million represented 34% of the outstanding SLAs between ILQ

and Harrison Associates, NFA commenced its investigation to determine the ultimate source of the January 2013 capital infusion and ensure that ILQ properly disclosed any person who contributed 10% or more of the firm's capital. NFA also wanted to determine if Harrison Associates had the financial wherewithal to continue funding ILQ. In addition, NFA wanted to check to see if there was any suspicious activity in connection with the capital infusion which was of particular interest to NFA based on the relationships among ILQ, and its owners, and, among others, J. Martinez and his sons, Isaac and Jacob Martinez.

83.     As an initial step in the investigation, NFA sent a letter to ILQ in March 2013 outlining the records NFA needed to verify the source of funds, which included, among others records, ILQ's January 2013 bank statements and monthly bank statements from October 2012 through February 2013 for Navitas, Harrison Associates and any individual, entity or holding company that contributed funds to Harrison Associates for purposes of infusing capital — either directly or indirectly — into ILQ.  Moreover, since ILQ had attempted during NFA's 2011 exam to provide statements for Harrison Associates that had been edited to show only the transactions related to ILQ, NFA's March 2013 request specifically asked for non-redacted copies of all statements. ILQ responded by producing some of the requested documents, e.g., ILQ and Navitas bank statements that NFA had requested.

84.     ILQ and its manager James Pieron, were required, jointly and severally, to pay a fine to NFA of $225,000 for their violations, and ILQ was also required to withdraw from NFA membership within 120 days. Finally, ILQ was required to pay restitution in the amount of $123,152.32 to ILQ customers to compensate them for ILQ's wrongful acts.

85.     The acts of ILQ, Navitas, Next Step, I-Trade, Isaac Martinez, Lisa Estrada and Market Traders were unlawful acts involving, violation of bank secrecy law, and mail fraud All of these acts fall within the definition of "racketeering activity" under 18 U.S.C. § 1961(1).

86.     All of the Defendants collectively, on numerous dates and times, through a pattern of racketeering as set forth in paragraphs 6 through 84 herein, engaged in unlawful acts in violation of RICO (the "Forex Fraud Schemes"), which caused Plaintiff Susan Martinez damage.

87.     In particular, Plaintiff Susan Martinez was injured in her business and property by the on-going criminal actions of Defendants in violation of RICO.  Plaintiff's property interest in Market Traders was damaged by its criminal acts and participation in the criminal acts of others, including Defendants.   As a participant and conduit for criminal enterprise, the value of Defendant Market Traders as a legitimate and law abiding entity was diminished, if not eradicated.

88.     All conditions precedent to filing this action have been satisfied or waived, and this action is timely filed.

## COUNT I
### (Civil RICO-federal)

89.     Plaintiff realleges and incorporate paragraphs 1 through 88 above as if set forth in full herein.

90.     This count is brought by Plaintiff against Defendants alleging a cause of action under 18 U.S.C. § 1962(d), for conspiring to violate 18 U.S.C. § 1962(c).

91.     At all relevant times, the Plaintiff and Defendants Jacob Martinez, Isaac Martinez, Joshua Martinez and Lisa K. Estrada (the "Individual Defendants")   as well as Defendants Market Traders, Market Traders Institute, ILQ, Navitas, Next Step, EForex, FXCT and I-Trade are "persons" pursuant to 18 U.S.C. § 1961(3).

92.     At all relevant times, Market Traders, Market Traders Institute, ILQ, Navitas, Next Step, EForex, FXCT and I-Trade together with the Individual Defendants engaged in an "enterprise" pursuant to 18 U.S.C. § 1961(4) as described above.

93.     At all relevant times, the companies, Market Traders, Market Traders Institute, ILQ, Navitas, Next Step, EForex, FXCT and I-Trade, and the Individual Defendants engaged in, and their respective activities affected, interstate and foreign commerce, pursuant to 18 U.S.C. § 1961(4).

94.     All of the USPS mailings and the numerous telephone calls, faxed communications, e-mails and internet postings on Market Trader website by Defendants and the conduct by Defendants relating to financial institution fraud based on the affairs of an enterprise affecting interstate commerce through a pattern of racketeering set forth above were made in furtherance of the Forex Fraud Schemes and the subsequent cover-up by the Defendants. Therefore, all of these communications were made in violation of the mail and wire fraud statutes.   Additionally, the Forex Fraud Schemes were made in violation of the financial institution fraud statute.   The Plaintiff was damaged by one or more of these mails and wires and the financial institution fraud. This pattern of mails and interstate wire-communications as well as the financial institution fraud occurred over a multi-year period of time from the date the Forex Fraud Schemes began, all in furtherance of the Forex Fraud Schemes and the conspiracy by the Defendants to engage in a massive cover-up. The Forex Fraud Schemes and cover-up victimized many persons in addition to the Plaintiff.

95.     In addition to the unlawful transfers and acts set forth in the paragraphs above, Plaintiff Susan Martinez has been damaged in her ownership/property interests in Defendant Market Traders by the following transactions:

- June 1, 2013, Defendant Market Traders issues cash distributions to Shareholders of Record in the total amount of $123,106 and declares ownership interest in Market Traders as Jacob Martinez 79.2%, Jared Martinez 10.8% and Isaac Martinez 10%;

- September 25, 2013, Defendant Market Traders issues cash distributions to Shareholders of Record in the total amount of $243,750 and declares ownership interest in Market Traders as Jacob Martinez 40%, Jared Martinez 40% and Isaac Martinez 20%;

- July 15, 2014, Defendant Market Traders declares ownership interest in Market Traders as Jacob Martinez 39.6%, Jared Martinez 39.6%, Isaac Martinez 19.8% and Joshua Martinez 1%.

96.     Collectively, the transactions and ownership allegations involving Defendant Market Traders set forth in paragraph 95 herein, were part of an on-going unlawful scheme involving  transmission of funds by wire and mail, as well as the intentional manipulation of ownership percentages in Defendant Market Traders by the Defendants Jacob Martinez, Isaac Martinez, Joshua Martinez and Mr. Jared Martinez, to facilitate the on-going Forex Fraud Schemes and the subsequent cover-ups of such schemes.

97.     As detailed above, each of the Defendants agreed to the Forex Fraud Schemes, and also, to further perpetrate it, by covering it up, through the various RICO enterprises.

98.     As detailed above, all of the Individual Defendants were in managerial positions in the Defendants enterprises and also directed activities, which they did.

99.     Accordingly, each Defendant agreed to participate in the affairs of one of the Defendant enterprises through the commission of the Forex Fraud Schemes and its cover-up,

which is a pattern of racketeering activity (mail and wire fraud as well as financial institution fraud).

100.    Thus, Plaintiff Susan Martinez asserts claims against all Defendants for conspiring to violate 18 U.S.C. § 1962(c), which prohibits any person employed by or associated with an enterprise from participating in the affairs of the enterprise through a pattern of racketeering activity.

101.    This conspiracy of Defendants as alleged herein to violate 18 U.S.C. § 1962(c) is a violation of 18 U.S. C. § 1962(d).

102.    As a result of the above-described racketeering activity, Plaintiff Susan Martinez has been damaged in her business and/or property.

103.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Susan Martinez is entitled to recover threefold her damages plus costs and attorneys' fees from the Defendants.

**WHEREFORE**, Plaintiff Susan Martinez demands judgment against Defendants, jointly and severely, for damages and equitable relief, including but not limited to, as follows:

a.  That Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

b.  That Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined

temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged.

c.  That Defendants be required to account for all gains, profits and advantages derived from their several acts of racketeering activity in violation of 18 U.S.C. § 1962(c) as well as from all other violation(s) of applicable federal law(s).

d.  That judgment be entered for Plaintiff and against Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 § U.S.C. 1962(c).

e.  That Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. § 1964(c), for any gains, profits, or advantages attributable to all violations of RICO.

f.  That Defendants pay Plaintiff pre-judgment and post-judgment interest, costs of the lawsuit incurred herein and attorneys' fees.

g.  That Plaintiff has such other and further relief as this Court deems just and proper, under the circumstances of this action.

## JURY DEMAND

Plaintiff Susan Martinez demands a trial by jury on all claims set forth in the Amended Complaint.


DATED:  March 14, 2016                         Respectfully submitted,

                                               HENRICHSEN SIEGEL, P.L.L.C.
                                               1648 Osceola Street
                                               Jacksonville, Florida 32204
                                               Phone: (904) 381-8183
                                               Fax: (904) 212-2800

                                               */s/ Neil L. Henrichsen*
                                               Neil L. Henrichsen
                                               Florida Bar No. 0111503
                                               nhenrichsen@hslawyers.com

Copies to: service@hslawyers.com

**Trial Attorneys for Plaintiff**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2016, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By: *s/ Neil L. Henrichsen*
Neil L. Henrichsen